Cite as 2020 Ark. App. 150

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-19-832

|  |  |
|---|---|
| | **Opinion Delivered:** February 26, 2020 |
| ALLURA RING AND CARL RING<br><br>APPELLANTS | APPEAL FROM THE SHARP COUNTY CIRCUIT COURT [NO. 68JV-18-211] |
| V. | HONORABLE MICHELLE HUFF, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellants Allura and Carl Ring separately appeal the July 26, 2019 order of the Sharp County Circuit Court adjudicating their daughter, M.R., dependent-neglected based upon neglect and parental unfitness. We affirm.

The facts of this case are not in dispute. The Arkansas Department of Human Services (DHS) was contacted through the child-abuse hotline on December 11, 2017, concerning three-month-old G.R. who presented to White River Medical Center (WRMC) with brain damage and skull fractures after Carl compressed his chest several times causing G.R. to stop breathing. G.R. was subsequently transported to Arkansas Children's Hospital (Children's) and further examination revealed a corner fracture of the tibia and humerus bilateral fractures to the arm. DHS made a true finding against Carl on December

11 for suffocation, bone fracture, and skull fracture. A protection plan was put in place on December 14, allowing Allura to keep G.R. in her custody under the stipulation that Carl was to have no contact with the child. A seventy-two-hour hold was placed on G.R. on January 29, 2018, after DHS learned that Allura had returned to the home of Carl with G.R. DHS made a true finding against Allura on January 29 for failure to protect. Allura and Carl stipulated on March 16 that G.R. was dependent-neglected "based on the child having suffered an injury which is inconsistent with the medical history provided by the parents."[1] On June 5, Allura and Carl executed consents to the termination of their parental rights to G.R. The court entered an order terminating their parental rights by consent on June 19.

DHS received another report through the child–abuse hotline on November 26, for a threat of harm. DHS arrived at WRMC where Allura had just given birth to M.R. According to the hotline report, Carl had been seen at the hospital following M.R.'s birth. Allura was asked about Carl's presence at the hospital as well as what her intentions were upon being discharged, including what safety factors were in place to protect M.R. Allura refused to answer DHS's questions without having a lawyer present, and a seventy-two-hour hold was subsequently placed on M.R. DHS filed a petition for emergency custody and dependency-neglect with supporting affidavit on November 27. In the petition, DHS alleged that M.R. was dependent-neglected as a result of neglect or parental unfitness.

The adjudication hearing took place on July 18, 2019, and recounted the facts surrounding G.R.'s numerous injuries. Mark Counts of the Sharp County Sheriff's Office

---

[1]The adjudication order was not filed until July 24, 2018.

2

testified that he received a call on December 11, 2017, concerning a child being abused. He stated that he went to WRMC and met with Allura and Carl. He said that he subsequently traveled to Children's and again met with Carl. He testified that Carl "confessed to abusing his child." According to Sheriff Counts, Carl's father had called Carl and asked him to go check on the chicken houses. When Carl received the call, Allura was in the shower, so he took G.R. with him. Sheriff Counts further testified,

> They live close to their family farm, across the road. And he said that the baby had been fussing, been talking how the baby had been fussing since it was born. The baby continuous [sic] cried. Got over to his parents' house and the baby had got so upset that it was distressing him. And he demonstrated showing us how he – what I would consider CPR, pressing on the chest of the baby so it would quit breathing. He said the baby would quit crying for a short period of time and then the baby would start screaming again. And then he would press on his chest again and done that a series of three or four times: and then the last time the baby didn't respond. And so that's when he took the baby back to his wife over at their house and called 911. He just described in the description he just described doing CPR on the child till it quit breathing. I handcuffed him and escorted him out of the building and placed him under arrest. As a result of that arrest charges were filed against him[.]

Sheriff Counts stated that after the arrest, he had no further contact with Carl.

Dr. Rachel Clingenpeel, an assistant professor of pediatrics at the University of Arkansas for Medical Sciences (UAMS) and the associate director of the Team for Children at Risk at Children's, testified as an expert witness in child-abuse pediatrics at the adjudication hearing. She stated that when she first evaluated G.R., "he had a period of cardiac arrest" and had to be resuscitated. She said that G.R. was ultimately diagnosed with six different bone fractures: two different fractures of his skull in two different locations; a fracture of one of his scapulae; and three different metaphyseal fractures, also known as

corner fractures. She said that he also had a hypoxic ischemic brain injury.[2] She opined that corner fractures are "highly associated with physical abuse in infants," and are located at the ends of long bones. She testified that she made a medical diagnosis of child physical abuse based on the totality of G.R.'s injuries. Dr. Clingenpeel stated that Carl told her he had G.R. with him at the time of G.R.'s "collapse." However, she stated that she received histories from Allura and Carl separately and there was nothing in those histories that would explain why G.R. went into cardiorespiratory arrest in the first place or that would explain the numerous fractures. She testified that the injuries to G.R. were "a cause of serious threat of death." She stated that he was "clinically dead for a period of time before he was resuscitated." Dr. Clingenpeel said that G.R. suffers from profound permanent effects and was "permanently and entirely disabled as a result of this. And he will require total care. He will be dependent on caregivers for as long as he lives." She testified that Carl told her, "I am afraid I have killed my son."

Wendy Holland, G.R.'s adoptive parent, testified that G.R. is quadriplegic and functions on a level of zero to three months despite being twenty-two months old at the time of the hearing.

Kim Lavespere, the caseworker assigned to M.R., testified that she, along with FSW Karen Payne, went to WRMC on November 26, 2018, following a hotline call. She stated that they talked to Dr. Genevieve White, the OB doctor, and the RN, Stephanie Wade. She said that they attempted to talk to Allura, but Allura refused to answer without an attorney present. She testified that she had concerns for M.R.'s health if Carl had access to

---

[2]A type of injury to the brain due to deprivation of oxygen.

4

M.R. Lavespere stated that she was also the caseworker assigned to G.R. and that initially, Allura was allowed to maintain custody of G.R. "for a short time" because there was a protection plan in place and Allura had the "appropriate response to the incident." She said that G.R. was removed from Allura on January 29, 2018, a day after Allura made contact informing Lavespere that she and G.R. had returned from Texas and was "questioning whether or not Carl had actually abused G.R." Lavespere completed a home visit on January 29 and found personal items belonging to Carl, although Allura maintained that Carl was living in a camper on the property. Lavespere stated that she tried to give Allura other housing options before removing G.R., but Allura indicated that "she was not willing to leave the home." According to Lavespere, Allura and Carl were living together at the end of G.R.'s case. She stated that at some point during G.R.'s case, she explained to Allura and Carl that if they decided to have another child, the situation would have to be assessed because the safety factor was still a concern and she would need to have a place separate from Carl in order for the child to be safe. She testified that before removing M.R., she asked Allura where she was living, and Allura refused to answer.

On cross-examination, Lavespere gave the following pertinent testimony:

> I went to White River Medical Center because of the hotline call that I received, the report that I received through the hotline. The last time I had seen Allura Ring before I went to White River Medical Center was in 2018. It would have been probably April or May of [2018] and then this was in November of 2018.

> When I entered the hospital room it was myself, FSW Karen Payne, Angela Ring, and Allura Ring. Before I reached the hospital, I hadn't made any decision regarding the ultimate action I would take. We were wanting to identify a discharge address that would be separate from Carl Ring. And I was not able to obtain that. I told everyone[,] including Mrs. Ring who is present in the courtroom what information I was looking for. I told her and others in the room that this was a very important factor in this safety assessment. I received no response.

5

Allura testified that when she returned to Arkansas, she resumed a relationship with Carl. She stated that she would have had to permanently disassociate herself from Carl in order to get G.R. back. She said that instead, she chose to give up her rights to G.R. because she felt that was best for him. She stated she got pregnant with M.R. around February or March 2018 while G.R. was in DHS's custody. She testified that when she gave birth to M.R., "no one told [her] that Carl was the problem." She said that before she went to WRMC to give birth, she and Carl were living together as husband and wife. She stated that she did not think Carl had hurt G.R.

On cross-examination, Allura stated that Carl was never alone with M.R. at the hospital and that he did not even get near her because he was sick. She stated that she did not want to answer DHS's questions at WRMC because she was "cautious" after her involvement with them in G.R.'s case. She testified that due to her religion, divorce is not an option except for adultery. She acknowledged that she has never been ordered by the court or anyone else to divorce Carl. She stated that when she and Carl were living together, there were no "little ones running around." When asked whether she had an opportunity to set up ground rules concerning Carl's access to M.R., she testified,

> Perfectly honest, I've been dealing with DHS before you have those kinds of conversations. If she comes home, blah, blah, blah. But we had to kind of wait to see if she was even going to come home. We had heard stories, ghost stories of dealings with DHS and things like that. So, it was always a fear. But at the time of removal, Carl had never had any unsupervised access to M.R. Carl had been in the same room, but he didn't touch her or anything. He stood on the opposite side of the room and I held her. He didn't ask to hold the baby. He had his hands in his pockets. He just wanted to look at her. Our nurse, Stephanie Wade, stood by the computer. We had kind of had a heart-to-heart about what could happen. Nurse Wade was very sweet. I did not hear anybody there ask Carl to leave.

6

Upon examination by DHS, Allura acknowledged that she told Lavespere that she did not believe Carl had done anything wrong. She stated that she also told her mother that she "didn't believe or was starting to believe that Carl didn't do anything wrong." When questioned by the ad litem, Allura stated that it was not that she and Carl were not willing to live separately, it was that their religion would not allow permanent disassociation. She further testified:

> No one told me I had to divorce my husband. DHS and the Court's order said I needed to establish my own residence. That I needed a source of income so that I could pay for that. At no point did anyone say that I had to legally divorce my husband. After that I did move to Texas. Again, after I came back to Arkansas, we did live separate. And then it was made clear that that wasn't acceptable. From that point forward I never established my own home. When I left to go to the hospital to have M.R., I left the marital home that I share with my husband. I didn't have things for M.R. before she was born there. They were all at my mother-in-law's house. We were all kind of just waiting to see what happened. I knew there was a substantial risk that M.R. would not be allowed to stay with me if I was with Carl Ring. On my own assumption, yes.

> Honestly, no. I did not know when I refused to answer Ms. Lavespere's question as to where I lived that there was a substantial risk that M.R. would be removed from me if I lived with Carl Ring. I stopped knowing that when I didn't answer her questions, I didn't realize she was going to take my daughter because I didn't answer her questions. That's what I mean. I assumed there was a risk. Yes, I had that knowledge when I refused to answer Ms. Lavespere's question. Sorry. I got confused. I'm sorry. I have had time since M.R. was born to establish my own home to show this Court that I was willing to separate from Carl Ring. I haven't done that. I remain married to him and I intend to stay married to him.

Allura told the court that she did not have any intentions of separating from Carl as far as divorce. She stated that they "would pray about [it] and determine whether [they] could separate physically or by home for the time, yes, to get M.R. back. But as far as divorcing, no." She also stated that Carl slept next to her "last night." She asked the court to return M.R. home to her and Carl. She further stated that she and Carl had taken

7

parenting classes; Carl has taken anger-management classes; and she underwent a psych evaluation. She contended that what happened to G.R. was a "horrible accident," and they "can do better."

Allura and Carl unsuccessfully made motions to dismiss at the conclusion of DHS's case. Jo Ferguson Davis, a CASA advocate, testified that she had been M.R.'s CASA worker since January and had had several visits with M.R. since that time. On cross-examination by the ad litem, Davis stated that CASA was not recommending that M.R. be returned home at this time.

After closing arguments, the court stated the following:

> I can't remember which member of the Supreme Court said I know it when I see it when referring to the obscenity laws. And maybe that's the reason parental unfitness isn't defined. But in this case. I know it when I see it. This is parental unfitness if I have ever even thought about reviewing it. This is not an allegation where we have got a 14-year-old kid that might have been spanked a little too hard or something. We are talking about an infant, a three-month-old infant with two skull fractures and numerous other injuries. He is now a quadriplegic. I don't know how long he will live in that state, but he has got to have around-the-clock care, probably at taxpayer expense. And from where I sit, it is the fault of Carl Ring[;] and Ms. Allura Ring did nothing to protect her child from that abuse.

> And the severity of the potential and the risk of harm is something that cannot be ignored. It absolutely cannot be ignored. Because I feel like if I followed the logic that you presented, Mr. Bristow, that we somehow have to wait when she has another child and he's around and say, oh, well, let's wait, let's just all sit here and twiddle our thumbs and see if this one gets brain damage, no. I don't think that's the law. I don't think that – well, that's not the law.

> So, I am finding that M.R. is dependent-neglected, that she has been neglected by her mother. Her mother's failure to protect her from her father and her own admission that she intends to stay married to him and would go right back to him with that child if she is placed back into her care is very, very telling. I honestly was kind of surprised to hear that Ms. Ring completed the 12th grade. There is apparently some psych evals that have been accomplished in G.R.'s case that I did not see. But I am aghast. So, I am also going to find that they are both unfit. They are both unfit to parent this child at this time, and M.R. needs to remain in

8

the Department of Human Services' custody and foster care. Mr. Ring should never be around any child.

The adjudication order was filed on July 26 in which the court found M.R. dependent-neglected as a result of neglect and parental unfitness. The order stated in pertinent part:

a. Specifically, the Court finds that there is evidence before the court that a prior child of Carl and Allura Ring, was grievously injured while in the care of the parents, that Carl Ring made statements to law enforcement to the effect that he had squeezed [G.R.'s] chest until he stopped breathing, and that Carl Ring currently has felony charges pending for those injuries. The parents had previously consented to a termination of parental rights as to [G.R.].

b. The Court heard testimony from Dr. Rachel Clingenpeel, whom the Court finds credible, that she had made a diagnosis of child abuse on [G.R.], based on [G.R.] having multiple fractures including a scapula fracture and two skull fractures and a hypoxic brain injury, and that the statements provided by the parents initially as to these injuries were not consistent, but that the brain injury was consistent with Carl Ring's statement about squeezing the infant's chest until the infant stopped breathing.

c. The Court finds that Allura Ring had knowledge that the Department's position was that [s]he could not have had [G.R.] returned to her custody unless she was separated and living independently from Carl Ring, whether or not she legally divorced him, and she returned to the marital home in early 2018, and resumed living with Carl Ring.

d. The Court finds that [M.R.] was born on November 26, 2018, and by her own testimony, the mother, Allura Ring, was still living in the home with Carl Ring as a husband and wife prior to giving birth and had been living in that home subsequently.

e. Further, the Court finds, even after listening to the testimony of Dr. Clingenpeel, which the Court finds credible, the mother testified under oath she believes Carl Ring did not harm [G.R.], and that the injuries were the result of an accident.

f. The Court finds this constitutes failure to take reasonable action to protect the juvenile from abuse or parental unfitness when the existence of this condition is known or should have been known on the part of Allura Ring.

g. The Court finds the evidence demonstrates parental unfitness on the part of both Allura Ring and Carl Ring.

Both Allura and Carl filed timely notices of appeal. This appeal followed.

Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof.[3] Dependency-neglect allegations must be proved by a preponderance of the evidence.[4] In reviewing a dependency-neglect adjudication, we defer to the circuit court's superior position to observe the parties and judge the credibility of the witnesses.[5] We will not reverse the circuit court's findings unless they are clearly erroneous.[6] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[7]

The juvenile code defines a dependent-neglected juvenile to include any juvenile who is at substantial risk of serious harm as a result of neglect or parental unfitness as it pertains to the juvenile, a sibling, or another juvenile.[8] The definition of neglect includes the failure to take reasonable action to protect the juvenile from abuse, neglect, or parental unfitness when the existence of this condition was known or should have been known.[9]

---

[3]Ark. Code Ann. § 9-27-327(a)(1)(A) (Repl. 2015).

[4]Ark. Code Ann. § 9-27-325(h)(2)(A)(2) (Repl. 2015).

[5]*Merritt v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 552, 473 S.W.3d 31.

[6]*Id.*

[7]*Id.*

[8]Ark. Code Ann. § 9-27-303(18)(A) (Repl. 2015).

[9]Ark. Code Ann. § 9-27-303(36)(A)(iii).

An adjudication of dependency-neglect occurs without reference to which parent committed the acts or omissions leading to the adjudication; the juvenile is simply dependent-neglected.[10]

Allura agues that the evidence is insufficient to support the court's finding that M.R. was dependent-neglected as a result of neglect or parental unfitness as it relates to Allura. This argument ignores the fact that at this juncture, the concern is whether the child is dependent-neglected, not which parent's actions or inactions caused the adjudication. Allura maintains that in order for M.R. to be deemed dependent-neglected based on what transpired with G.R., there has to be some sort of "nexus between the harm presented by the parent to the child who was dependent-neglected and the level of risk presented by the parent to the child in the current case."

Allura contends that M.R. was adjudicated dependent-neglected based on G.R.'s previous adjudication. Here we had extensive testimony about the numerous injuries suffered by G.R. as well as his current medical state as a result of those injuries. Despite evidence that G.R.'s injuries were the result of physical abuse, Allura refused to believe that Carl intentionally hurt G.R. She indicated to the court that she may be willing to separate from Carl long enough to get M.R. back but she was not interested in a permanent separation. She wanted the court to return the child back to her and Carl and insisted that they "can do better." The court did not adjudicate M.R. dependent-neglected based merely on the fact that G.R. had previously been adjudicated dependent-neglected. The evidence shows that the severity of the injuries suffered by G.R., Allura's refusal to hold Carl

---

[10]*Merritt*, *supra*.

11

accountable for G.R.'s injuries, and her willingness to allow Carl into M.R.'s life, placed M.R. at substantial risk of serious harm. These facts support a finding of dependency-neglect based on neglect and parental unfitness. Accordingly, we affirm.

Carl also argues that the evidence is insufficient to support the court's finding that M.R. was dependent-neglected as a result of neglect or parental unfitness. He makes several subarguments in support of his challenge to the adjudication. However, his arguments are without merit. The undisputed evidence shows that Carl physically abused G.R., causing G.R. to now be quadriplegic and need around-the-clock aid. There is no doubt that a parent who abuses a child to that extent is unfit. Thus, M.R. is at substantial risk of serious harm due to Carl's unfitness. Carl argued below that the term "parental unfitness is void for vagueness."[11] However, there is no indication that the argument was fully developed below or that the court ruled on Carl's argument. He now challenges "parental unfitness" in his appeal before us. Absent a specific ruling on the constitutional claims, we are precluded from addressing it on appeal.[12] Even if the court had ruled on Carl's void-for-

---

[11]The specific argument was as follows:

Also, there is no definition for parental unfitness. That being so, this statute regarding parental unfitness is void for vagueness. If there is not a definition there, how is the Court to know how to apply parental unfitness? I understand there is some case law that could possibly help out. But that is not what the Court is to look at. These are creatures of statutes. The legislature should give a definition for parental unfitness whenever it requires DHS to prove their case. DHS should have to do that without a definition in there leaving -- makes this statute vague. So parental neglect should not be found.

[12]*See Smith v. State*, 363 Ark. 456, 215 S.W.3d 626 (2005).

vagueness claim, we would be unable to address his challenge as he has failed to provide notice to the Arkansas Attorney General as required.[13]  Accordingly, we affirm.

Affirmed.

ABRAMSON and GLADWIN, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for separate appellant Allura Ring.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for separate appellant Carl Ring.

*Ellen K. Howard*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.

---

[13] *See* Ark. Code Ann. § 16-111-111 (Repl. 2016).