Cite as 2021 Ark. App. 146

# ARKANSAS COURT OF APPEALS

DIVISION III

No. CV-20-593

| | |
|---|---|
| ALLURA RING | **Opinion Delivered:** March 31, 2021 |
| APPELLANT | APPEAL FROM THE SHARP COUNTY CIRCUIT COURT [NO. 68JV-18-211] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE MICHELLE HUFF, JUDGE |
| APPELLEES | AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant Allura Ring appeals from the order of the Sharp County Circuit Court terminating her parental rights to her daughter, M.R. (DOB: 11/26/2018). On appeal, Allura challenges the circuit court's finding that termination was in M.R.'s best interest. We affirm.

This case is inextricably linked to the termination of Allura's parental rights to a previous child, G.R. On December 11, 2017, the Arkansas Department of Human Services (DHS) received a child-abuse-hotline call concerning three-month-old G.R. who presented to the White River Medical Center (WRMC) and was later transported to Arkansas Children's Hospital with severe injuries including brain damage and skull fractures. DHS made a true finding against Carl Ring, the father, for suffocation, bone fracture, and skull

fracture.[1]  A protection plan was put in place allowing G.R. to remain in Allura's custody under the stipulation that Carl have no contact with G.R.  On learning that Allura and G.R. returned to Carl's home, DHS placed a seventy-two-hour hold on G.R.  DHS subsequently made a true finding against Allura for failure to protect.  Both Allura and Carl stipulated that G.R. was dependent-neglected and voluntarily consented to the termination of their parental rights to G.R. on June 19, 2018.

On November 26, 2018, DHS was again contacted through the child-abuse hotline for threat of harm alleging that Allura had just given birth to M.R. and Carl was present at the hospital and in the room with M.R.  Once DHS arrived to assess M.R.'s safety, Allura refused to answer questions without an attorney present.  Following Allura's refusal to cooperate and because she allowed contact between M.R. and Carl, a seventy-two-hour hold was placed on M.R.  The court entered an emergency-custody order placing M.R. in the custody of DHS, finding that immediate removal from Allura's and Carl's custody was in M.R.'s best interest and necessary to protect her health, safety, and welfare.  The court further found that because Allura's and Carl's parental rights to a previous child had been terminated due to injuries caused by Carl, DHS was deemed to have made reasonable efforts to prevent or eliminate the need for removing the child from the home.

A probable-cause order was entered on December 7 with the court finding that probable cause existed to continue M.R. in the custody of DHS.  Allura was ordered to follow the case plan; cooperate with DHS; obey orders of the court; maintain weekly

---

[1]Carl entered a plea of guilty to first-degree battery for the injuries suffered by G.R. and was sentenced to 336 months' incarceration in the Arkansas Department of Correction on January 6, 2020.

contact with DHS; keep DHS informed of current address and phone numbers; inform DHS of any changes in contact information; obtain and maintain clean, safe, and stable housing with utilities; allow DHS access to the home for monitoring purposes; obtain and maintain stable employment; watch "The Clock is Ticking" video; participate in and complete parenting classes; and remain drug-free and submit to random drug screens. Allura was granted supervised visitation at the discretion of DHS; however, the court noted, "[I]f mother is to be considered for reunification she must have separate home from Carl Ring."

At the July 18, 2019 adjudication hearing,[2] Allura testified that she believed Carl did not harm G.R. and that G.R.'s injuries were the result of an accident. M.R. was adjudicated dependent-neglected as a result of neglect or parental unfitness.[3] The goal of the case was set as reunification with a concurrent plan of adoption and relative custody/guardianship. Among other things, Allura was ordered to live separately from Carl. The court specifically stated, "Nothing less can remedy the issues which prevented removal." The circuit court declined to order a home study on the paternal grandparents, Angela and Ricky Ring, in light of the uncontroverted testimony of family service worker (FSW) Kim Lavespere that they live on the same property as Carl and Allura and that Angela has made statements that she also does not believe Carl harmed M.R.'s sibling, G.R.[4]

---

[2]Allura waived statutory time frames—delays stemmed from Carl's issues with counsel, the passing of the original presiding judge, continuance for good cause before the special judge, and the recusal of the next assigned judge.

[3]Allura and Carl appealed; this court affirmed the circuit court's dependency-neglect decision. *See Ring v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 150, 596 S.W.3d 75.

[4]On May 30, Carl filed a motion requesting that the court order a home study on his parents, Angela and Ricky, as well as a separate home study on his cousin, Ashley

3

A permanency-planning order was entered on January 29, 2020. In the order, the circuit court noted that Allura still did not believe Carl intentionally harmed G.R.; despite G.R.'s extensive brain injury and skull fractures, Allura believed it was an accident. The court further noted Allura admitted in testimony that Carl is a danger to M.R., yet she remains in a relationship with him. As a result, the circuit court found by clear and convincing evidence that Carl and Allura are unfit and that it "doesn't see any chance of reunification." The goal of the case was set as guardianship or adoption with a fit and willing relative. M.R. was placed with Wendy Holland, G.R.'s adoptive parent. DHS filed a petition for guardianship with Holland. However, in a review and guardianship hearing before the court on February 25, Holland indicated that she no longer wanted to proceed with the guardianship petition. Consequently, it was dismissed without prejudice, and M.R. was moved to another foster home.

DHS filed a second amended petition for termination of parental rights on May 28, alleging multiple statutory grounds.[5] DHS further argued that termination was in M.R.'s best interest because she is adoptable and would be at risk of harm if returned to the custody of either parent due to Carl's incarceration and Allura's poor judgment as a parent.

---

Pickering and her husband, Michael. Carl further requested that the court consider the aforementioned relatives, as well as Patricia Ward, Allura's mother—with an already approved ICPC home study—as possible custodial placements for M.R.

[5]DHS filed the first petition for termination of parental rights on January 11, 2019, as to Carl. A second termination petition was filed on May 8 as to Allura. The May 28 termination petition was filed against both Allura and Carl.

The termination hearing was held on June 10. The court heard testimony from the following witnesses: Allura, FSW Lavespere, Dr. George DeRoeck (licensed psychologist), Jo Davis (CASA advocate), and Angela Ring. The court also received a number of exhibits including certified pleadings pertaining to G.R. and M.R., Carl's sentencing order, a court report, a CASA report, and a psychological evaluation prepared by Dr. DeRoeck.

On July 22, the circuit court entered an order terminating Allura's parental rights on the following statutory grounds:[6] (1) life-endangering abuse;[7] (2) subsequent factors;[8] and (3) aggravated circumstances.[9] The court found Allura's testimony not credible and stated that she had been "splitting hairs" and "playing fast and loose." In addition to grounds, the court found it was in M.R.'s best interest to terminate parental rights. Allura now appeals.

This court reviews termination-of-parental-rights cases de novo.[10] Grounds for termination of parental rights must be proved by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established.[11] The appellate inquiry is whether the circuit court's finding that

---

[6]On June 10, prior to the termination hearing, Carl voluntarily relinquished his parental rights to M.R.; he is not a party to this appeal.

[7]Ark. Code Ann. § 9-27-341(b)(3)(B)(vi)*(a)* (Supp. 2020).

[8]Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*.

[9]Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)*.

[10]*Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001).

[11]*Tillman v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 119.

the disputed fact was proved by clear and convincing evidence is clearly erroneous.[12]  A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[13]  In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses.[14]

To terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent.[15]  The circuit court must also find by clear and convincing evidence that one or more statutory grounds for termination exist.[16]  Proof of only one statutory ground is sufficient to terminate parental rights.[17] Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child.[18]  The intent behind the termination-of-parental-rights

---

[12]*Id.*

[13]*Id.*

[14]*Id.*

[15]Ark. Code Ann. § 9–27–341(b)(3)(A)(i) & (ii).

[16]Ark. Code Ann. § 9–27–341(b)(3)(B).

[17]*Tillman, supra.*

[18]*Id.*

statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective.[19]

On appeal, Allura does not challenge the sufficiency of the evidence supporting the statutory grounds for termination of her parental rights. She argues only that the circuit court erred in finding that termination was in the best interest of her child. Even within Allura's best-interest argument, she does not challenge the circuit court's finding regarding adoptability. Instead, she argues (1) insufficient evidence supported the potential-harm factor of the best-interest analysis, and (2) termination was not in M.R.'s best interest because there was a less restrictive alternative. Because she has not challenged the circuit court's decision as to the grounds for termination or adoptability, we need not address them on appeal.[20]

Allura first argues that the circuit court's finding that M.R. would be at risk of potential harm if returned to her custody is supported by insufficient evidence. She contends that although she initially struggled with separating from Carl due to her Christian beliefs and values regarding divorce, she finally took the necessary steps to reunify with M.R. Allura also asserts that despite her use of the word "accident" to describe what happened to G.R., she "readily accepted" that Carl was responsible for G.R.'s injuries. Allura relies on a psychological evaluation in which it was noted that she had "a number of doubts"

---

[19]Ark. Code Ann. § 9-27-341(a)(3).

[20]*Everly v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 528, 589 S.W.3d 425.

regarding Carl's statements about his role in harming G.R. Allura further argues that she successfully established a life separate from Carl and does not pose a risk of harm to M.R. Additionally, Allura states, "Carl was incarcerated and was sentenced to a significant period of incarceration. The harm he posed had been alleviated."

Potential harm must be viewed in a forward–looking manner and in broad terms.[21] A parent's failure to protect provides an adequate basis for finding that a child would be subject to potential harm if returned to the parent and will support a potential-harm finding.[22] Here, from the outset of the case, Allura was instructed to separate from Carl in order to reunify with M.R. However, despite the serious injuries suffered by G.R. at the hands of Carl, and the repeated orders of the court, Allura was unwilling to permanently end her relationship with Carl. Although she claims that she has now separated from him, a parent's past behavior is often a good indicator of future behavior.[23] Allura's actions demonstrated a disregard for M.R.'s safety and an inability to put M.R.'s needs before Carl. Further, while Allura may be living apart from Carl at this time, we are unconvinced that the separation is due to personal choice and not simply a forced consequence of Carl's incarceration. Whatever the situation may be, we cannot overlook Allura's testimony that she would resume a relationship with Carl upon his release from prison. A parent's failure to sever a relationship with an abusive partner is evidence of potential harm.[24] Likewise,

---

[21]*Jackson v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 440, 503 S.W.3d 122.

[22]*Tovias v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 337, 601 S.W.3d 161.

[23]*See Parnell v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 108, 538 S.W.3d 264.

[24]*Apelu v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 480, 422 S.W.3d 210.

Allura works on Carl's family farm and lives on his family's land. In reality, she has not distanced herself from Carl in any aspect of her life, other than what was beyond her control due to his prison sentence. Allura also testified that, while remaining married, she was willing to live separately from Carl and would have limited contact with him. However, the court found Allura's testimony not credible. Credibility determinations are left to the fact-finder.[25] Additionally, the same evidence that supports the uncontested grounds for termination also supports the potential-harm finding.[26] Accordingly, we hold that sufficient evidence supports the potential-harm factor of the circuit court's best-interest analysis.

Allura also argues that the circuit court's decision to terminate her parental rights instead of pursuing relative placement as a less restrictive alternative demonstrates reversible error. She argues that the paternal grandparents, Angela and Ricky Ring, were willing to accept custody of M.R., had a relationship with M.R., and had visited M.R. throughout the case, yet DHS never investigated them as a placement option.

Allura argues that when making a best-interest determination where there is a relative available for placement as a less restrictive option, the circuit court must consider factors such as the need to preserve the child's relationship with a grandparent; the ability of the parent to provide child support to the child; the existence of a "less drastic measure . . . such

---

[25] *Brown v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 370, 584 S.W.3d 276.

[26] *See Miller v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 396, 525 S.W.3d 48 (finding clear and convincing evidence supports the best-interest finding because the same evidence that supports the aggravated-circumstances ground also supports the potential-harm prong of the circuit court's best-interest finding).

as a no-contact order or supervised visitation"; the benefit for the child of continued contact with the parent while the child is living with a relative and not having an "indeterminate state" working against the child; and if the child is living in continued uncertainty.[27]

Allura contends that Angela and Ricky were never investigated as a placement option for M.R., and they were effectively "shut out" of the case. Allura argues that this was not in M.R.'s best interest as she was bonded with her grandparents. She additionally asserts that multiple factors articulated in *Phillips*[28] weigh in favor of preserving the familial bonds. Particularly, Allura argues that M.R. had a relationship with her grandparents who had visited her throughout the case; Allura was employed and able to provide child support; a less drastic measure—such as supervised visitation that had been used during the case—could continue; and continued contact with Allura was beneficial to M.R. because they shared a bond.

We point out that Allura's contention that the factors listed above must be considered in a best-interest analysis is inaccurate. Likelihood of adoptability and potential harm are the two factors that *must* be considered by the circuit court in making a best-interest determination.[29] Other considerations in making a best-interest finding *may* include factors such as those discussed in *Phillips*.[30] Despite Allura's assertion to the contrary, the failure to consider such discretionary factors does not warrant reversal.

---

[27]*Phillips v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 383, 585 S.W.3d 703.

[28]*Supra.*

[29]*Chaffin v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 522, 471 S.W.3d 251.

[30]*Supra.*

Allura describes the severance of bonds between M.R. and her family as "tragic." However, in order to protect M.R.'s health, safety, and welfare, she was removed from Allura's custody at birth and placed in the custody of DHS. At the time of the termination hearing, M.R. was eighteen months old. Any relationship she developed with her family was in the context of the DHS case. Particularly, although Allura takes issue with the severance of "Angela and Ricky's" bond with M.R., there is no evidence in the record that Ricky attended any visitation with M.R. or even one court proceeding throughout the pendency of the case.

Also, while Allura argues that she is employed and able to provide financial support for M.R., we found that problematic, as well. Allura testified that she works on the Ring Poultry Farm for her in-laws, Angela and Ricky. She also lives on their property. While Allura testified that she owns the small home, Angela and Ricky own the property the home sits on. Allura further testified that she has no plans to move the home. Whereas Allura contends that she has managed to live separately and independently from Carl, we are wholeheartedly unconvinced. Carl's parents own the business that employs Allura. Carl's parents own the land Allura's home sits on. Allura testified that she and Angela rode to the termination hearing together. Allura has refused to untangle her life from Carl's family. Because she and Angela are so intertwined and share the same beliefs that Carl did not intentionally harm G.R., the same potential-harm concerns that are applicable to Allura are also applicable to Angela. Consequently, placing M.R. with Angela and Ricky would not be in her best interest.

11

Allura also relies on *Clark v. Arkansas Department of Human Services*,[31] in which the court made clear that it is necessary to preserve family relationships prior to termination because even if the grandparents remain a part of the case following a termination, "no relative preference is given to grandparents over foster parents under this court's case law." While Allura attempts to analogize the present case to *Clark*, the facts are distinguishable. In *Clark*, we held that the circuit court's decision to forgo a relative-placement option in favor of termination was clearly wrong under the circumstances. In that case, the grandparents had a longstanding relationship with the children, placing the children with the grandparents created no safety concerns, and the grandparents were the *appellant's* relatives. Here, M.R. has been in DHS custody since birth. Any relationship she had with Angela and Ricky was limited and occurred through DHS-supervised visitation. There were concerns that placing M.R. with Angela and Ricky could put M.R.'s safety at risk. Moreover, Angela and Ricky are not appellant's parents or maternal relatives;—they are M.R.'s paternal grandparents; therefore, any rights and relationship they had were not derivative of appellant's relationship with M.R. To be clear, Angela's and Ricky's relationship with M.R. was not severed by the termination of Allura's parental rights but by their son's, Carl's, voluntary relinquishment of his parental rights to M.R.[32]

Furthermore, DHS made substantial efforts to place M.R. with a relative. FSW Lavespere testified that Allura's mother, Patricia Ward, obtained an approved Interstate Compact on the Placement of Children (ICPC) home study, yet declined placement.

[31]2019 Ark. App. 223, at 19, 575 S.W.3d 578, 589.

[32]*See Clark, supra.*

12

Wendy Holland, a paternal cousin and G.R.'s adoptive mother, initially pursued guardianship but later chose not to proceed. Lavespere testified that DHS also looked into an aunt and a distant cousin as possible placement options for M.R. Furthermore, at the adjudication hearing, the circuit court did consider Angela and Ricky as placement options. Due to Angela's position regarding the cause of G.R.'s injuries, the court declined to order a home study. Angela maintained her position throughout the case; therefore, the court had no reason to revisit the issue.

After a de novo review, we are not left with a definite and firm conviction that a mistake has been committed. Therefore, we affirm the order terminating Allura's parental rights to M.R.

Affirmed.

HARRISON, C.J., and HIXSON, J., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Callie Corbyn*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Casey D. Copeland*, attorney ad litem for minor child.

13