Cite as 2025 Ark. App. 512

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CV-25-260

| | |
|---|---|
| MELISSA CROSIER<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><br>APPELLEES | Opinion Delivered October 29, 2025<br><br>APPEAL FROM THE MILLER COUNTY CIRCUIT COURT<br><br>[NO. 46JV-23-37]<br><br>HONORABLE CARLTON D. JONES, JUDGE<br><br>AFFIRMED |

**CASEY R. TUCKER, Judge**

Appellant Melissa Crosier appeals the Miller County Circuit Court's order terminating her parental rights. On appeal, Crosier argues the circuit court erred in finding (1) statutory grounds to support termination; and (2) that termination was in the children's best interest. We affirm the circuit court's decision to terminate Melissa's parental rights.[1]

Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents. *Smith v. Ark. Dep't of Hum. Servs.*, 100 Ark. App. 74, 264 S.W.3d 559 (2007); *Belue v. Ark. Dep't of Hum. Servs.*, 104 Ark. App. 139, 144, 289 S.W.3d 500, 504 (2008). However, parental rights are secondary to the best interest of the child. *Belue, supra.* Cognizant of the significance of cases in which parental rights are at stake, we review the

---

[1]The circuit court also terminated the parental rights of the children's father, John Crosier. John did not appeal.

background of this case.

On March 13, 2023, the Arkansas Department of Human Services (the "Department") filed a petition for dependency-neglect of Melissa's s two minor children, Minor Child 1 (MC1), age eight; and Minor Child 2 (MC2), age four. The Department alleged the children were dependent-neglected due to neglect and/or parental unfitness. On February 14, the Department received a hotline report alleging that MC1 and MC2 were left home alone. After the children's parents, Melissa and John Crosier ("Crosiers"), had been taken into custody following a traffic stop, the Department placed the children on a seventy-two-hour hold. Later in the day, the Crosiers were released from custody, and the children were returned to the Crosiers' care provided that the parents would follow the recommended services and case plan for the safety of the children.

On March 19, the Department completed an assessment of the Crosiers' home. There were nine cats inside and six dogs outside the home. The kitchen had a strong smell of urine. There was a hole in the kitchen ceiling with a tarp hanging down.[2] At the time, the home was fairly clean, and the children had new mattresses on their beds. The Department was unable to access the laundry room or the garage due to a malfunctioning door.

On April 19, the Department received sixty-nine photos of the interior of the home from the landlord. The photos showed clothing and flammable materials piled around,

---

[2]Melissa said that they were planning to repair the hole when they received their next paychecks.

2

under, and behind appliances, creating a fire hazard; mold and insects were covering dishes and utensils in the sink and on the counters; the hole in the kitchen ceiling had not been repaired, and the tarp was no longer covering it; trash was piled in the children's bathroom and in the master bathroom sink and behind the toilets; and there was an unknown substance resembling marijuana in Ziploc bags. Employees from the Department went to the home the same day but were unable to gain access. When they returned later, the children were not there.

The following day, April 20, the Department returned with law enforcement to remove the children. Melissa allowed the Department to leave with the children, and the Department exercised an emergency hold over the children.

The Department filed a second petition for dependency-neglect on April 25 alleging the children were dependent-neglected due to neglect and/or parental unfitness. The court issued an ex parte order for emergency custody on May 2. The circuit court found that despite the services being provided, the house had further deteriorated, making the "residence not safe and adequate to [e]nsure the health and safety needs" of MC1 and MC2. Under the emergency order, the Department was granted custody of the minor children.

The court held a probable-cause hearing on May 16. As reflected in the agreed probable-cause order, the Department and the Crosiers agreed there was probable cause that the emergency conditions that necessitated removal of MC1 and MC2 from the parents' custody continued and that it would therefore be in the children's best interest to remain in the custody of the Department.

The court held an adjudication hearing on May 15 and entered its order on May 30. The circuit court found the children were dependent-neglected as a result of neglect and parental unfitness due to the Crosiers' failure to provide shelter for the children that did not pose a risk to their health or safety. The Crosiers were ordered to complete the services of the case plan, including provider-recommended services; to obtain and maintain safe and stable housing; to allow the Department to complete home visits; to obtain and maintain stable employment; and to participate in parenting classes.

After a review hearing on July 19, the circuit court entered an order finding that the Department was in compliance with the case plan and orders of the court and had made reasonable efforts to provide family services and finalize a permanency plan for the children. While the court found that the Crosiers had demonstrated progress toward the goal of the case plan by actively working the services and had begun to remedy and understand the issues that caused the removal of the children, their compliance was limited because they didn't allow the Department to observe the conditions of the home's interior, and eviction proceedings had been initiated against them. The Crosiers were allowed to begin unsupervised visitation on the condition that the visits occurred in a public space and not at their residence. The goal of the case continued as reunification with a concurrent goal of relative placement.

A second review hearing was held on September 6. The Department was again found in compliance with the case plan and orders of the court, and it was making reasonable efforts to provide the services consistent with the case plan. The Crosiers were found in

compliance with the case plan, with the exception of the housing issue. They had reported making a down payment on a "tiny" house and property.[3] The goal of the case remained unchanged.

A third review hearing was held on December 20. (The status of the case was unchanged since the findings of the court were the same as previously found at the September 6 review hearing.) Both the Department and the Crosiers were in compliance. The Department was making reasonable efforts, and the Crosiers were working the services. Visits with MC1 and MC2 were still unsupervised. At this time, the Crosiers reported making a downpayment on the tiny house and property, but the Department had been denied access to any residence. The safety concerns that prevented trial placement with the Crosiers included the continued concerns with the condition of the home last observed by the Department, the parents' limited compliance with allowing the Department into the current home, and hygiene.

The circuit court held a permanency-planning hearing on April 3, 2024, and entered the order on April 15. Aside from the court's finding that the Crosiers were in partial compliance with the case plan and orders of the court, their housing was still unfinished and not suitable. The order reflects the Crosiers' continued refusal to allow "the Department into the home to provide services and observe the conditions of the interior of the home as well as issues with decision making and hygiene." The court changed the case goal to

---

[3]The Crosiers were ordered to maintain housing and to allow the Department access to their residence.

5

adoption with a concurrent goal of guardianship or permanent custody with a relative since the process had started on a known relative pursuant to the Interstate Compact on the Placement of Children ("ICPC").

The Department filed its petition for termination of parental rights on April 18, 2024. The termination hearing was scheduled for June 26 but was continued by agreement to allow the ICPC home study and checks to be performed for the relatives who had come forward requesting consideration.

A review hearing held on September 11 found that one of the relatives had withdrawn from the ICPC process—resulting in a denial—and the other relative had not yet received an ICPC response. The Department withdrew its petition for termination of parental rights, finding that Melissa had reportedly purchased a mobile home. The Crosiers were found to be in compliance with the case plan and orders of the court and had demonstrated progress toward the goal of the case, having worked some of the services. There were still issues noted with hygiene and limited compliance because the Department had not been allowed into the home. The goal of the case was set as relative placement with a concurrent goal of adoption.

A fifth review hearing was held on November 13. Notably, the Crosiers had separated, and John was living in New York. Melissa had maintained employment, completed parenting classes, submitted to a psychological evaluation, and maintained appropriate contact with the children. The conditions of Melissa's mobile home, the number of animals in and out of the home, transportation, and hygiene were all continued concerns for the court. The mobile home required work on the interior before it would be appropriate for the children

6

to reside there. The court found that the parents had not demonstrated progress toward the goal of the case because the environmental concerns of the home that were present at the start of the case continued to exist. The goal of the case was changed to adoption with a concurrent goal of relative placement.

As a result, the Department filed a second petition for termination of parental rights on November 27. Three grounds were alleged in support of the Department's petition for termination:

- That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the [D]epartment to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

. . . .

- That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

. . . .

- The parent is found by a court of competent jurisdiction, including the juvenile division of the circuit court, to:
  (3)
  (A) Have subjected any juvenile to aggravated circumstances.
  (B) "Aggravated circumstances" means: (i) A juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification.

The termination hearing commenced on January 15, 2025. Rachack Fagan, the primary caseworker assigned to the case since September 2024, testified on behalf of the Department. Fagan testified that Melissa has had three residences since the start of the case. When the case first started, Melissa was living in Texarkana and denied the Department access many times. She was renting the residence at that location and was evicted due to the environmental risks and concerns with the home. The Department had concerns about that residence because it was not safe. Melissa had nine cats and seven dogs, a snake, and a rat. Fagan testified that Melissa was aware that the environment was the primary concern of the Department at that time. The Crosiers then bought land in Emmet that included a shell home with no utilities, which was forty-two miles from Texarkana where Melissa worked. The Department visited the shell home, but it was not fit for human habitation. The Crosiers were residing in the shell home using buckets for restroom activity. They still owned five dogs and several cats. The Emmet property was repossessed due to nonpayment of the loan. Finally, Melissa bought a mobile home in Emmet that required updating. There were approximately ten animals on the property, both inside and out.

Fagan testified that the issues that caused removal had not been remedied. Safety and habitability issues continued throughout the case at each residence. The Crosiers had failed to remedy the Department's concerns with respect to their parental fitness. By this time, John had moved to New York with his new girlfriend and had been there since August.

The Department presented evidence as to the best interest of the children. Fagan testified that the children were thriving in foster placement together, and in her opinion, termination would provide them with permanency. She stated that it would potentially be harmful to return the children to Melissa because she had not shown any type of behavior change or willingness to comply until the termination petition was filed. Fagan testified that there was nothing further the Department could provide or do for the Crosiers to negate termination. The first Fagan was able to see inside Melissa's current home occurred the day before the termination hearing. She did not deem the home safe or appropriate for the children. The children's rooms were set up with beds, but the windows were not sealed correctly, allowing air to penetrate. There was also a heater in the middle of the living room floor. The rooms still needed painting. While the kitchen was appropriate, the bathroom Fagan was able to see had an unstable floor with only the subfloor showing. As for the outside of the home, there was "trash everywhere" in the front and back of the home that someone was attempting to burn. Fagan testified that the outside trash was not necessarily a reason to terminate, but it was not safe for the children to be at the home because they could get hurt on the debris.

Ruth Ann Murphy, the adoption specialist, testified that there were no known factors that would prohibit adoption. A data match resulted in 140 possible matches. A potential adoptive placement had already been identified within the children's current support system.

John testified on his own behalf. Since he was living in New York, he admitted he did not have a stable home for the children. He admitted that Melissa was living in her home

only two days a week because of her transportation issue[4]—she was working in Texarkana but living in Emmet. Despite these issues, John testified that the children should be placed with Melissa.

Melissa testified on her own behalf. She had been living in the mobile home in Emmet since October 2024. She acknowledged it was not fit and proper for the children when she first purchased the home. She testified that since October, she had removed the damaged walls by rebuilding them. She still needs to replace her bathroom sink and the toilet, but the other bathroom had a working sink, shower, and toilet. She had begun painting the rebuilt walls, but she had several rooms and walls to complete. She had also began tiling the bathroom floor. She testified that the kitchen and living room were ready and usable. However, the heater needed a new fuse, and she needed a new thermostat. She testified that she had not been told by the Department that there was anything that needed to be done inside her trailer for the safety of the children. She currently had four dogs and was taking care of John's dog until he returned to pick it up. She worked at Burger King in Texarkana for almost two years as the assistant manager and was living at the home only two days a week.

The attorney ad litem called Laura Dryden, the CASA appointed to the case, who was concerned about the stability of the home environment for the children. She testified that while Melissa loves the children and had been trying really hard, she did not believe

[4]Melissa did not have a working vehicle.

Melissa was able to offer a stable home environment. She was concerned about the lack of consistent childcare while Melissa worked, her lack of transportation, and Melissa not having a valid driver's license. With regard to Melissa's home, she did not see a major safety hazard for the children inside; however, she was concerned about the flooring at the front door as well as the amount of trash outside the home.

The court terminated Melissa's parental rights on all three statutory grounds and found termination was in the best interest of the children by order dated February 12, 2025. Melissa timely appealed.

Melissa's arguments on appeal amount to a challenge to the sufficiency of the evidence. Melissa argues that the court lacked clear and convincing evidence to terminate her parental rights, and the Department did not prove it was in the best interest of the children. We disagree.

> A court may order termination of parental rights if it finds clear and convincing evidence to support one or more statutory grounds listed in the Juvenile Code, Ark. Code Ann. § 9-27-341(b)(3)(B), and that termination is in the best interest of the child, taking into consideration the likelihood of adoption and the potential harm to the health and safety of the child that would be caused by returning him or her to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A).

*Boomhower v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 397, at 7, 587 S.W.3d 231, 235. This court reviews termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Jennings v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 429, 636 S.W.3d 119; *Ring v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 146, 620 S.W.3d 551. A finding is clearly erroneous when, even though there is evidence to

11

support it, "the reviewing court on the entire evidence is left with a definite conviction that a mistake has been made." *Jennings*, 2021 Ark. App. 429, at 7, 636 S.W.3d at 124. Credibility determinations are left to the circuit court, not the appellate court. *Boomhower*, *supra*.

To terminate parental rights, the circuit court must find that at least one statutory ground was proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3)(B) (Supp. 2023). Here, the circuit court terminated Melissa's parental rights on three grounds: (1) failure to remedy; (2) subsequent factors; and (3) aggravated circumstances. On appeal, only one ground needs to be proved to support termination; thus, to warrant reversal, the circuit court must have clearly erred on all three grounds. *McGaugh v. Ark. Dep't of Hum Servs.*, 2016 Ark. App. 485, at 7, 505 S.W.3d 227, 232.

The first ground on which the circuit court based its decision—the failure to remedy—was set forth in paragraph 8.A. of the order as follows:

> Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*a*) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

Facts in support: [MC1] and [MC2] have been out of the custody of the parents since April 20, 2023. The juveniles were adjudicated dependent-neglected on May 15, 2023 for neglect and parental unfitness. The parents were evicted from the residence due to the conditions they allowed the residence to reach. The conditions that caused the removal of the juveniles have not been remedied because the parents still lack appropriate housing or have not shown an understanding of the negative effects lack of hygiene and environmental neglect has on the juveniles.

12

Clear and convincing evidence supports the finding that the children were out of Melissa's custody for over a year, and Melissa had not remedied the conditions that caused removal despite the meaningful effort by the Department to rehabilitate Melissa and correct the conditions that caused removal. We affirm on this ground and will not address the other two grounds the court found to support termination. *McGaugh*, *supra.*

Melissa argues that the minor children were removed from her custody for lack of appropriate housing and that the court's use of facts involving hygiene to reach termination on this ground was clearly erroneous. Melissa cites *Guthrey v. Arkansas Department of Human Services*, 2017 Ark. App. 19, 510 S.W.3d 793, as support for her argument that the circuit court violated the statutory requirement that the failure-to-remedy ground must be focused on the specific conditions that caused removal.

In *Guthrey*, the children were removed from the home and declared dependent-neglected for issues directly related to the mother's drug use. However, the circuit court terminated her rights due to the mother's poor judgment. This court reversed the termination and held that the circuit court violated the statutory requirement that the failure-to-remedy ground be focused on specific conditions that caused the removal. The evidence presented reflected that Guthrey had fully remedied her drug problem, and the term "poor judgment" was "so vague as to be essentially meaningless." *Id.* at 7, 510 S.W.3d at 797.

Here, in support of the failure-to-remedy ground, the court stated that "the parents still lack appropriate housing or have not shown an understanding of the negative effects lack of hygiene and environmental neglect has on the juveniles." The court found environmental neglect related to the lack of hygiene, and it was *never remedied*. *Merriam-Webster's Collegiate Dictionary* defines "hygiene" as the "conditions or practices (as of cleanliness) conducive to health." *Hygiene*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/hygiene (accessed Oct. 22, 2025) (archived at https://perma.cc/89TB-2ADA). The Department had limited access to Melissa's homes, but their observation of her first home revealed clothing and flammable materials piled around, under, and behind appliances, creating a fire hazard; mold and insects covering dishes and utensils in the sink and on the counters; the hole in the kitchen ceiling; trash piled in the children's bathroom and in the master bathroom sink and behind the toilets. After being evicted from that home, she moved to a home with no utilities and no operating toilets. Melissa's current home was still under repair—despite having twenty-one months to remedy the inadequacy of her housing. These concerns clearly show lack of hygiene and are consistent with the court's finding of environmental neglect or inappropriate housing.

Melissa argues that her last home—the home she was residing in at the termination hearing—was appropriate. In *Krusen v. Arkansas Department of Human Services*, 2024 Ark. App. 294, 687 S.W.3d 902, we affirmed a termination on the failure-to-remedy ground where the mother still lacked safe, suitable housing despite twenty-two months of services. Under the failure-to-remedy ground, the fact that a parent begins to make improvements as termination

14

becomes more imminent will not outweigh other evidence demonstrating a failure to comply and remedy the initial removal from the parents' home. *Id.*

Throughout the twenty-one months of this case, Melissa failed to maintain safe and stable housing that did not pose a risk to the health of the children. She often refused to let the Department inspect the different homes she lived in while the case was pending. At no time during the course of the case was there proof that she had habitable housing despite efforts to make a "plan." She had three different homes. The Crosiers were evicted from the first home, which had fire hazards, smelled of urine, and had mold and insects. The second "shell" home was not habitable: it had no utilities, and they used buckets as a toilet. Melissa's home for two days a week at the time of the termination hearing, while showing improvement, still needed work to be safe and habitable. The Department presented testimony about the concerns with the mobile home—it had one space heater in the middle of the living room floor; the bedroom windows were not sealed properly, allowing air to seep in; and the bathroom subfloor was still showing and not stable. Melissa, herself, admitted the home did not have a working heater at the time of the termination hearing in January.

Melissa asked the court for more time and argues on appeal that the court erred by denying her request for more time to provide appropriate housing for the children. Evidence of Melissa's last-minute efforts to provide appropriate housing does not outweigh the twenty-one months of evidence of her failure to comply and to remedy the situation that caused the children to be removed in the first place. *Garlington v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 124, 542 S.W.3d 917. A child's need for permanency and stability may override a

parent's request for more time to improve the parent's circumstances. *Kloss v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 389, 585 S.W.3d 725. We hold that the court did not err in denying Melissa's request for additional time.

To the extent Melissa argues on appeal that her rights were terminated because she is poor, we will not address this argument because it was not raised below and cannot be raised for the first time on appeal. *Chacon v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 277, at 8, 600 S.W.3d 131, 13.

We now turn to the best interest of the children. Before entering an order forever terminating parental rights, the circuit court must find clear and convincing evidence that termination is in the child's best interest. Ark. Code Ann. § 9-27-341(b)(3)(A); *Phillips v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 169, 596 S.W.3d 91. In determining best interest, the court must consider the potential harm if the child is returned to the parent and the likelihood of adoption.[5] *Id.* The court in *Phillips* explained:

> Potential harm, as well as adoptability, is merely a factor to be considered—it is not an element of the cause of action and need not be established by clear and convincing evidence. *Chaffin v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 522, 471 S.W.3d 251. It is the best-interest finding that must be supported by clear and convincing evidence. *Id.* The harm referred to in the statute is "potential" harm; the trial court is not required to find that actual harm will result or to affirmatively identify a potential harm. *Id.* Moreover, evidence on this factor must be viewed in a forward-looking manner and considered in broad terms. *Id.* A parent's past behavior is often a good indicator of future behavior and may be viewed as a predictor of likely potential harm should the child be returned to the parent's care and custody. *Rickman v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 261, 548 S.W.3d 861.

[5]The court found the children to be adoptable, and adoptability was not raised as an issue in this appeal.

2020 Ark. App. 169, at 5–6; 596 S.W.3d at 95–96.  The court is not required to find actual harm would occur but, rather, that there is potential harm. *Id.*

In the present case, the court focused on Melissa's failure to follow through with the case plan to provide a habitable and safe home. Clear and convincing evidence demonstrated that Melissa failed to provide a safe home for her children despite moving and being offered services. Melissa had twenty-one months to remedy the Department's housing concerns. A court may consider past behavior as a predictor of likely potential harm should the children be returned to the parent's care and custody. *McVay v. Ark. Dep't Hum. Servs.*, 2021 Ark. App. 328, at 11, 634 S.W.3d 800, 806. Failure to provide stable housing and to comply with court orders demonstrates potential harm to the children. *Rivera v. Ark. Dep't Hum. Servs.*, 2018 Ark. App. 405, at 16, 558 S.W.3d 876, 885.  Accordingly, we affirm the court's finding that termination was in the best interest of the children.

Because there was ample proof in this case on both the statutory grounds for termination and the best interest of the children, we cannot say the circuit court clearly erred in terminating Melissa's parental rights.

Affirmed.

ABRAMSON and VIRDEN, JJ., agree.

*Elizabeth James*, Arkansas Commission for Parent Counsel, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.