Cite as 2026 Ark. App. 125

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CV-25-635

| | |
|---|---|
| | Opinion Delivered February 25, 2026 |
| DYLAN HISE | |
| APPELLANT | APPEAL FROM THE LOGAN COUNTY CIRCUIT COURT, SOUTHERN DISTRICT [NO. 42BJV-23-27] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE TERRY SULLIVAN, JUDGE |
| APPELLEES | AFFIRMED |

**CASEY R. TUCKER, Judge**

Appellant Dylan Hise appeals the Logan County Circuit Court's order terminating his parental rights to his minor child ("MC"). On appeal, Hise argues the circuit court erred in finding (1) statutory grounds to support termination; and (2) that termination was in MC's best interest. We affirm the circuit court's decision to terminate Dylan's parental rights.[1]

Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents. *Smith v. Ark. Dep't of Hum. Servs.*, 100 Ark. App. 74, 264 S.W.3d 559 (2007);

---

[1]The circuit court also filed an order terminating the parental rights of Samantha Catlett, MC's mother. Samantha filed a notice of appeal. After the record was lodged, Samantha filed a motion asking that her appeal be dismissed, which was granted. For purposes of this appeal, we address the issues only with reference to Dylan, although the court may have made findings directed to Samantha as well.

*Belue v. Ark. Dep't of Hum. Servs.*, 104 Ark. App. 139, 144, 289 S.W.3d 500, 504 (2008). However, parental rights are secondary to the best interest of the child. *Belue, supra.* Cognizant of the significance of cases in which parental rights are at stake, we review the background of this case.

On October 16, 2023, the Arkansas Department of Human Services (the "Department") filed a petition for dependency-neglect and emergency custody of MC alleging that MC was dependent-neglected as the result of abuse, neglect, and parental unfitness. As reflected on the affidavit attached to the petition, on October 8, Samantha and Dylan discovered two-year-old MC lethargic and unresponsive. Samantha called for an ambulance, and MC was transported to the hospital. MC was hypothermic with a noted body temperature of 80.4 degrees. He was also severely malnourished, weighing only eighteen pounds and three ounces, which was less than he weighed at the age of seven months. Samantha reported that MC was nonverbal and had developed a food aversion around the age of two. At the time, MC was eating only applesauce and fine oatmeal, which had been ongoing for approximately six to eight months. A team decision meeting was held on October 12, 2023. Dylan admitted that he knew MC needed medical attention but refused to get MC help for fear that the Department would remove him.

The Department placed a seventy-two-hour hold on MC, and MC was removed from Samantha and Dylan's custody on October 12. The Department filed its petition for dependency-neglect and emergency custody on October 16, alleging that MC was dependent-

2

neglected because of abuse, neglect, and parental unfitness. An ex parte order for emergency custody was entered the same day, and the probable-cause hearing was set for the next day.

At the hearing, the parents stipulated that probable cause existed, and the circuit court found probable cause for the Department to take emergency custody of MC and that it was in the best interest of MC for MC to remain in the custody of the Department. The adjudication hearing was set for December 19, 2023.

At the adjudication hearing, the circuit court found MC dependent-neglected due to medical neglect. The parents did not provide MC with any medical care for over two years, and at the time the hold was exercised, he was malnourished to the point that he weighed less than he did at his six-month check-up in October 2021. MC required the insertion of a feeding tube to get the nourishment he needed. The parents were both criminally charged in connection with their care of MC.

Also at the adjudication hearing, the court found that Dylan was not a legal parent to MC because he and Samantha were not married at the time of MC's birth, and he was not listed as the father on MC's birth certificate. The court ordered Dylan to submit to DNA paternity testing. Dylan was ordered to watch the video *The Clock is Ticking*; submit to psychological evaluations as well as drug-and-alcohol assessments; participate in individual counseling and intensive parenting classes; and to maintain stable employment, suitable housing, and reliable transportation. The goal of the case was set as reunification. The court acknowledged that the parents had been cooperative and compliant with the Department's requests since the hold was exercised and granted visitation between MC and the parents to

be supervised by the Department. The court also thanked the foster mother, Hannah Catlett, for her care of MC.[2] The court set the review hearing for March 19, 2024.

At the review hearing, the court found that the Department had complied with the case plan and orders of the court and made reasonable efforts to provide family services and finalize a permanency plan for MC. The parents had completed their psychological evaluations but had not started intensive parenting classes because the Department still needed to make those referrals. The court noted that Dylan was unemployed and needed to get a job, that Dylan needed to complete his DNA paternity test by the next hearing date, and that the parents needed to provide an update on the status of their pending criminal charges at the next hearing. The goal of the case remained reunification. A second review hearing was set for July 2, 2024.

At the second review hearing, the court found Dylan to be the biological father of MC following the court's review of DNA paternity test results. The court also admitted Dylan's psychological evaluation into evidence. The court found that Dylan was making slow progress but that Dylan had not yet started counseling and still needed to complete his comprehensive diagnostic assessment, which he was ordered to complete as soon as possible. The court also informed Dylan that he needed to think about getting a home or place of his own. The Department was found to be in compliance with the case plan and orders of the

---

[2]Hannah was MC's maternal aunt with whom MC had been placed upon his discharge from the hospital.

court and that it was making reasonable efforts to provide family services. The goal continued as reunification. A permanency-planning hearing was set for October 1, 2024.

In the order from the permanency-planning hearing, the court found:

> The Court believes that the parents love their child. They made the terrible mistake of not taking the child to the hospital when he desperately needed medical help. The Court acknowledges that the parents have both had some medical issues, but they still need to step up their progress in this case. . . . The parents need to get back on track with keeping their appointments. They also need to have appropriate housing.

The court again found the Department was compliant and had made reasonable efforts. The goal of the case remained reunification. At the end of the hearing, the court set the fifteen-month-review hearing for January 7, 2025.

At the fifteen-month-review hearing, Dylan's counseling records were introduced into evidence. The court noted issues in the home where Dylan was currently living that needed to be resolved. The court also suggested that the Department aid Dylan in obtaining baby gates. The court authorized the Department to begin trial home placement once the Department was satisfied that everything was "okay" in the home. Dylan stated that he was having serious health issues, and the court noted that it hoped these issues would not interfere with the trial home placement. Dylan was authorized to have visitation with MC outside the home before the trial home placement. Dylan was ordered to participate in family or couples counseling, and the Department was directed to make the necessary referrals. An additional review hearing was scheduled for April 1, 2025.

In the order from the April 1 review hearing, the court reprimanded the parents and noted that there were concerns that the home was not in proper order or properly child

proofed. The court noted serious concerns that it took too long for Dylan to fix a flat tire and repair a broken window, cautioning that it had been eighteen months since the Department had gotten involved. The court withdrew its prior order granting the Department discretion to begin a trial home placement, finding that there would be no trial home placement without prior approval of the court. The court also encouraged the Department to engage an agency, such as Triple P Parenting, to help Dylan with his parenting skills. The court held that if there was not significant improvement, the case may proceed toward termination of parental rights. The goal of the case remained reunification, and a review hearing was set for July 1.

On May 27, the Department filed its petition for termination of parental rights. The Department alleged three grounds in support of its petition for termination: (1) MC had been out of Dylan's custody for twelve months, and he had failed to remedy the cause for removal; (2) other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate the placement of MC in Dylan's custody is contrary to MC's health, safety, or welfare and that Dylan had shown an incapacity or indifference to remedy those subsequent factors; and (3) Dylan subjected MC to aggravated circumstances with little likelihood of successful reunification despite services being provided.

At the July 1 review hearing, the Department announced that it had filed a termination petition and that a full review hearing was therefore not necessary. The court agreed and scheduled a termination-of-parental-rights hearing for July 15.

6

At the termination hearing, Brooklyn Cook, MC's speech-language pathologist, testified first. She had been providing MC with receptive-language, expressive-language, and feeding therapies since February 2023. She offered to meet Dylan and discuss feeding therapy in March 2025, but he did not follow through. She testified she was planning to provide Dylan with handouts that she had for parents, which suggested ideas to incorporate at mealtimes, including where the child is developmentally and which foods are more appropriate. She did not know whether the parents would have needed that appointment to be able to properly feed MC. She testified that she thought it would be helpful so that she could explain what she was working on in feeding therapy, talk about the handouts, and answer any questions Dylan might have had. Cook acknowledged that MC was diagnosed with expressive- and receptive-language disorder and a severe eating disorder. Cook was also aware of MC's autism diagnosis, although she did not make that diagnosis. When he first started therapy, MC did not say any words during his evaluation. He did not play with many toys appropriately. He did not have back-and-forth reciprocal turn-taking skills. He was only tube fed at the time. Cook testified that MC was making good progress in both eating and in speech therapy.

Terra Reames, the Department's caseworker who had been on the case for the past six and a half months, testified that MC was doing well and recently had his feeding tube removed. MC had gained some weight and was a "happy little fellow" most of the time. According to Reames, the Department was concerned with Dylan's lack of initiative to follow through with appointments to show that he was capable of taking care of MC. Dylan had

7

missed individual and family therapy appointments. There were eighty-nine family-time visitations offered, and seventy-three were utilized. There were twenty-three individual counseling sessions offered, and he attended thirteen. There were six family counseling sessions offered, and five were completed.

According to Reames's testimony, Dylan was invited to participate in other medical appointments throughout the case and did not participate in any other appointments.[3] According to Reames, the Department was uncertain about whether Dylan could financially care for MC because Dylan worked only part time at McDonald's. Dylan and Samantha were living with Samantha's mother, LaDonna, and her partner, Christopher. Christopher was rude to anyone who came to the home. According to Reames, the issues with Christopher did not rise to the level of stopping unsupervised visits in the home. The home was appropriate. They discussed some safety issues, and at times, those safety precautions were not implemented. There were stairs that needed a baby gate, space heaters on the floor needed to be blocked off, and there were some flooring issues in the kitchen. The Department had given them cabinet locks, plug outlet covers, and baby gates, which were not consistently utilized. These issues did not rise to the level of concern to stop the unsupervised visits from continuing.

---

[3]There was conflicting testimony about how many of MC's medical appointments Dylan had missed.

Reames testified regarding an unsupervised visit with Dylan during which MC went all day without food.[4] According to Reames, Hannah had provided a backpack full of diapers, wipes, food, and Boost drinks for MC for his unsupervised visit. The backpack returned home almost untouched. Samantha told Hannah that MC did not feel well because he didn't eat a whole lot and was sleeping, which was unusual. While Samantha said she thought MC had a fever, neither Samantha nor Dylan checked his temperature. Hannah checked his temperature after they dropped him off, and he did not have a fever. After that incident, the Department stopped unsupervised visits until May 14, 2025.

The Department supervised several visits between the parents and MC, and after May 14, the visits were allowed to be unsupervised with the restriction that the parents would provide video proof of MC eating during visitation. The Department provided Dylan with groceries for the visit on May 14. According to Reames, the Department was recommending termination of parental rights and proceeding with adoption. The Department could not be sure that the threat of harm was eliminated due to Dylan's lack of initiative and inability to show he could provide for MC. The Department was also concerned about Dylan's persistent health problems.

Reames testified that Dylan graduated from the Triple P program, although there were a few issues with certain safety precautions that were not used while Triple P was present. She also acknowledged that Dylan had watched *The Clock is Ticking*, completed

[4]The parents had unsupervised visitation until this incident occurred.

9

psychological evaluations, participated in some individual and family counseling, completed drug-and-alcohol assessments, and completed SafeCare. She also acknowledged that Dylan was working at McDonald's.

Veronica Elliott, a Department employee, testified regarding an appointment she attended with Samantha, MC, and the child's primary-care physician. Dylan was not in attendance during that appointment.

Thomas Black, a Logan County caseworker, testified regarding his interaction with the parents and the visits that he supervised. He made two attempts to deliver gas cards to the home, but no one answered the door. He had supervised visits from the inception of the case until the middle of 2024. According to Black, there were a lot of missed visits when either Dylan, Samantha or MC was sick. When the supervised visits did occur, Dylan would have repeated episodes of vomiting, and Dylan and Samantha would have to leave because Dylan was ill. At times, Black testified that he would arrive at the agreed meeting location for scheduled visitation, but Samantha and Dylan failed to appear. Visits weren't consistent when he was supervising them.

Pamela Feemster, the case supervisor, testified MC was severely malnourished, which caused him to come into the care of the Department. He was on a feeding tube for at least eighteen months. Feemster acknowledged that while Dylan had completed services, it was her opinion that he did not demonstrate any benefit from those services. According to Feemster, Dylan had not shown that he had the ability or the initiative to ensure that MC continued to have all his medical needs met because Dylan missed his own medical

appointments and did not participate in MC's medical appointments when he was invited to participate.

At the last hearing, Dylan was given more time to show he was able to meet MC's needs. The Department provided Dylan with a list of MC's upcoming appointments. Dylan failed to show up for the first appointment, but he did show up for the next two appointments. Feemster testified she believed termination of parental rights was still in MC's best interest because he needs permanency. While Dylan had made some progress, the Department was not any closer to recommending that MC be returned to his parents' custody than they were at the time of his removal. She testified that MC is adoptable, and there are no obstacles to adoption. Feemster testified;

| [ATT'Y AD LITEM]: | Can you explain why the Department is doing unsupervised visits and comes here today with a recommendation of terminating the parents' rights? |
| --- | --- |
| [FEEMSTER]: | Let me think about how to answer that. So I believe that the Department has gone above and beyond to work with these parents to try to reunify this family. We've gaven [sic] them chance, after chance, after chance. The biggest concern right now is their ability to ensure that this child continues to get his needed medical care when and if he was to be returned to them. We did start unsupervised visits. We were extending. We had moved from a four-hour unsupervised to a four-hour during the week and an all day on a Saturday. We initially had to stop those because, once again, he was being returned to the -- to the foster home with information that he's not being fed. They thought he was sick. They couldn't take his temperature because they didn't have any |

11

batteries in the thermometer. I mean, those are things that as a parent you need to step up and do. Especially when you have a child that was brought into care from near death because he laid in your house for the last six months not eating, not being fed, and not seeking – and the parents not seeking medical attention. So we had to stop those. Right now, we are back to the unsupervised visit, but it's only under the condition that they record themselves feeding [MC] so that we can ensure that he continues to get the nutrition that he needs and so that he doesn't backtrack on his feeding aversion. Because when he came into care, he had that feeding aversion, and he didn't want anything. We finally got him to a point to where he's eating orally. He doesn't have to have his G-tube no more. But if he stops eating, he's going to regress. We've seen that just from when he had to have the G-tube replaced from where he pulled it out. He had to go like 72 hours without any oral food and it was very, very difficult to get him back into the routine of eating orally again. So those are just concerns that we continue to have because they're not showing the ability to step up. [Alteration [sic] in the original.]

[ATT'Y AD LITEM]: Let me ask this: If termination is not granted today and the goal remains reunification, would the Department seek to increase the visitation at all?

[FEEMSTER]: I don't know. I wouldn't increase it today, no.

[ATT'Y AD LITEM]: Okay. As we sit here today, does the Department feel that it's safe for [MC] to be in the home with his parents longer than for five hours?

[FEEMSTER]: Not at this time, no.

[ATT'Y AD LITEM]: Okay. Thank you.

12

On recross-examination Feemster testified:

[APPELLANT'S COUNSEL]:    Where is [MC] placed?

[FEEMSTER]:    He is placed with Hannah.

[APPELLANT'S COUNSEL]:    And Hannah is who?

[FEEMSTER]:    It is Samantha's half-sister.

[APPELLANT'S COUNSEL]:    Okay. And why is guardianship not an appropriate alternative to reunification?

[FEEMSTER]:    The Department considered all options. I do not feel with the age of [MC] that guardianship was -- is not the best permanency option. But it was also a discussion that we've had with his current placement provider, and guardianship is not something that they'd be willing to do at this point. And so, that is why I am not looking – it's not the most appropriate permanency for [MC].

Hannah testified that MC was placed with her when he first came into the Department's custody. MC had made progress over time. Initially, MC was completely nonverbal and would not eat. He had to be fed around the clock every two hours. He didn't play or interact. According to Hannah, now he runs and plays all the time, and he loves to feed the chickens and pet the goats, and he jabbers nonstop.

Hannah confirmed the earlier testimony about the unsupervised visitation when she sent a backpack full of food and supplies, and MC returned home with the backpack that had barely been touched. Samantha told Hannah she was concerned MC was not feeling well, so she cleaned his snotty nose and crusty eyes. Hannah did not see those symptoms after MC was with her that evening. She checked his temperature, and it was in "the average

13

range". That evening, MC was hungry, and he consumed three of his shakes and two bowls of peanut butter and jelly, which was unusual for him at one sitting.

After a different unsupervised visit, Dylan apologized to Hannah for MC's face being dirty. Hannah had forgotten to send wipes that day. Hannah believed Dylan had towels, soap, and water at their house, but MC came home dirty because she didn't send any wipes.

The following colloquy took place with respect to Hannah's decision not to seek guardianship of MC:

| [DEPARTMENT'S COUNSEL]: | What ~ you heard Ms. Feemster's testimony, and she said that guardianship is not an option with you and your husband; is that correct? |
|---|---|
| [HANNAH]: | Yes, sir. |
| [DEPARTMENT'S COUNSEL]: | But you would like to adopt him? |
| [HANNAH]: | Yes, sir. |

Dylan testified that he has been employed at McDonald's for a little over a year. He testified that he and Samantha were living together in Booneville. He stated he was suffering from health problems that caused him to throw up blood. He had an endoscopy scheduled because the issues were getting worse. Dylan asked the court for more time to work on reunification. He stated that if the court would not allow reunification, he would not object to guardianship with Hannah, which he preferred over termination.

Samantha testified on her own behalf. She testified that she has a good relationship with Hannah. She believed she and Dylan had completed the services that were offered to

them. They were living together but recently had spent a few nights apart because of the stress of everything. They were still seeing each other and speaking daily. They were just taking some time apart.

The court inquired of the CASA representative, Pat Gabbard, who opined that MC would be better off with Hannah than in foster care because MC has a large, loving family. Gabbard agreed with the Department's petition to terminate.

The attorney ad litem stated that the parents had made a lot of progress in the case. However, because twenty-one months had elapsed since the Department had taken custody of MC, and in light of the testimony that the parties had separated, the attorney ad litem could not recommend reunification because it was not safe to return MC to his parents, and MC deserved permanency.

At the conclusion of the evidence and testimony, the court announced its ruling from the bench and terminated Dylan's parental rights on all three grounds pled by the Department—failure to remedy, subsequent factors, and aggravated circumstances. The court entered the written order on July 31. The court also found that termination was in MC's best interest. Dylan filed a timely notice of appeal on August 1.

Dylan's arguments on appeal challenge the sufficiency of the evidence. Dylan argues that the court lacked clear and convincing evidence to terminate his parental rights, and the Department did not prove termination was in MC's best interest. We disagree.

> A court may order termination of parental rights if it finds clear and convincing evidence to support one or more statutory grounds listed in the Juvenile Code, Ark. Code Ann. § 9-27-341(b)(3)(B), and that termination is in

15

the best interest of the child, taking into consideration the likelihood of adoption and the potential harm to the health and safety of the child that would be caused by returning him or her to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A).

*Boomhower v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 397, at 7, 587 S.W.3d 231, 235. This court reviews termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Jennings v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 429, 636 S.W.3d 119; *Ring v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 146, 620 S.W.3d 551. A finding is clearly erroneous when, even though there is evidence to support it, "the reviewing court on the entire evidence is left with a definite conviction that a mistake has been made." *Jennings*, 2021 Ark. App. 429, at 7, 636 S.W.3d at 124. Credibility determinations are left to the circuit court, not the appellate court. *Boomhower*, *supra*.

To terminate parental rights, the circuit court must find that at least one statutory ground was proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3)(B) (Supp. 2023). Here, the circuit court terminated Dylan's parental rights on three grounds: (1) failure to remedy; (2) subsequent factors; and (3) aggravated circumstances. On appeal, only one ground needs to be proved to support termination; thus, to warrant reversal, the circuit court must have clearly erred on all three grounds. *McGaugh v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 485, at 7, 505 S.W.3d 227, 232.

The first ground on which the circuit court based its decision—failure to remedy—was set forth in paragraph 8.A. of the order as follows:

Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*a*) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

> This case was initiated on October 8, 2023 and the case has been opened for over twenty-one months. As set out above in the Court's findings, the child has been out of the parents' custody and their home for over twelve months. The Department has made a myriad of efforts to work with the parents. Although they have completed some of the Case Plan and despite a meaningful effort by the Department to rehabilitate the parents and correct the conditions that caused removal, the conditions have not been remedied.

The written order also contained the following findings of fact with respect to Dylan's failure to remedy:

> This juvenile has been adjudicated to be dependent-neglected and has been out of the house for well over a year. The circumstances under which the child was brought into care were horrific. The child was severely malnourished and close to death. The Department has made a myriad of efforts to work with the parents. Although they have completed some of the Case Plan and despite a meaningful effort by the Department to rehabilitate the parents and correct the conditions, the conditions have not been remedied. The record is replete about the number of appointments that have been missed during the course of the case concerning counseling and various other appointments that have been missed. The testimony of the first witness, Brooklyn Cook, was that an appointment was set up with the parents and they did not make it. Recently there have been issues about the Department having to provide food for the parents for the child.

With respect to failure to remedy, Dylan does not dispute that MC has been out of his custody for over twelve months, nor does he dispute that the Department made meaningful efforts to rehabilitate Dylan and correct the conditions that caused removal. Dylan argues that the record reflects that he was compliant with the case plan and had

completed services offered to him. He further argues that he had been employed for over a year, had adequate housing, and was allowed unsupervised visitation until the termination hearing. According to Dylan's brief, "These are important and consequential facts as the action of allowing unsupervised visits and facilitating trial home placement is inconsistent with a finding that a parent has failed to remedy."

Dylan's arguments are not supported by the record. The reason MC was declared dependent-neglected was malnourishment and the failure to recognize MC's medical needs. Following MC's removal, Dylan was offered twenty-three individual counseling sessions and attended only thirteen. Dylan was offered meetings to discuss feeding issues with MC's therapist, and he failed to follow up with her. The testimony with respect to unsupervised visitation was that the Department had to suspend Dylan's unsupervised visitation with MC after it was discovered that MC was not fed during a visit even though Hannah provided a backpack of food when she dropped off MC. Dylan was again allowed unsupervised visitation, but it was limited to five hours with video proof that MC was being fed. Five hours of unsupervised visitation with the requirement to send proof of feeding is quite different from returning custody to a parent. *See Meriweather v. Ark. Dep't of Hum. Servs.*, 98 Ark. App. 328, 331–33, 255 S.W.3d 505, 507–08 (2007) (affirming the circuit court's finding that termination was in the child's best interest because raising a child is much more involved that weekly unsupervised visits, and appellant needed assistance during the unsupervised visits). The testimony of the caseworkers, the ad litem, and the foster mother was consistent that they were concerned that Dylan would be unable to provide proper

18

nourishment for MC. The circuit court's finding of termination on the failure-to-remedy-ground is supported by the evidence. We affirm on this ground and will not address the other two grounds the court found to support termination. *McGaugh, supra.*

We now turn to the court's best-interest finding. Before entering an order forever terminating parental rights, the circuit court must find by clear and convincing evidence that termination is in the child's best interest. Ark. Code Ann. § 9-27-341(b)(3)(A); *Phillips v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 169, 596 S.W.3d 91. In determining best interest, the court must consider the potential harm if the child is returned to the parent and the likelihood of adoption.[5] *Id.* The court in *Phillips* explained:

> Potential harm, as well as adoptability, is merely a factor to be considered—it is not an element of the cause of action and need not be established by clear and convincing evidence. *Chaffin v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 522, 471 S.W.3d 251. It is the best-interest finding that must be supported by clear and convincing evidence. *Id.* The harm referred to in the statute is "potential" harm; the trial court is not required to find that actual harm will result or to affirmatively identify a potential harm. *Id.* Moreover, evidence on this factor must be viewed in a forward-looking manner and considered in broad terms. *Id.* A parent's past behavior is often a good indicator of future behavior and may be viewed as a predictor of likely potential harm should the child be returned to the parent's care and custody. *Rickman v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 261, 548 S.W.3d 861.

2020 Ark. App. 169, at 5–6, 596 S.W.3d at 95–96. In regard to potential harm, the circuit court does not have to find actual harm would occur, nor does it have to affirmatively identify a potential harm. *Phillips*, 2020 Ark. App. 169, at 6, 596 S.W.3d at 96.

---

[5]The court found that MC is adoptable, and adoptability was not raised as an issue in this appeal. Because Dylan does not challenge the adoptability factor, we are not required to address it. *Lloyd v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 461, 655 S.W.3d. 534.

Dylan argues there is not sufficient evidence on the potential-harm element and also argues that termination was not the least restrictive means. We disagree.

With respect to Dylan's challenge to the sufficiency of the evidence, Dylan failed to prove that he could provide the basic necessity of life—MC's nourishment. Past behavior is indicative of potential harm. *Richardson v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 451. The record is replete with evidence that Dylan could not provide the basic needs for his child, including adequate food, safe shelter, and attending to MC's needs. Initially MC was brought into the custody of the Department for failure to thrive when he was severely malnourished and was suffering from hypothermia. Dylan admitted that he knew MC needed medical attention but refused to get the child help for fear that the Department would remove him from his care. Even after the Department provided services to Dylan, he still lacked understanding of what it took to care for MC—he required assistance with obtaining and providing MC with food; hygiene; and simple safety measures, such as baby gates to block the stairs. Further, in several of the interim orders, the circuit court ordered Dylan to obtain appropriate housing and to obtain full-time employment, and this remained a concern at the termination hearing. Failure to comply with the court's orders may be evidence of potential harm. *Gonzalez v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 425, 555 S.W.3d 915.

Finally, Dylan argues that the circuit court should consider less restrictive alternatives before finding potential harm. In his brief, Dylan argues that the circuit court erred in finding potential harm because MC had stability with his foster mother and aunt: Dylan's brief states, "When a child is already in a safe, stable relative placement, time is not a threat,

terminating rights unnecessarily is." Hannah testified that she was not seeking guardianship of MC and instead would consider adopting MC. Accordingly, Dylan's relative-placement and least-restrictive-means argument has no merit. The circuit court did not err in finding there was sufficient evidence of potential harm if Dylan's parental rights were not terminated.

Affirmed.

KLAPPENBACH, C.J., and HIXSON, J., agree.

*Elizabeth James*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain* and *Linda J. Hamilton*, attorneys ad litem for minor child.